**HOME BUILDERS ASSOCIATION OF NORTHERN CALIFORNIA; California Chamber of Commerce; Construction Materials Association of California; Building Industry Legal Defense Foundation; California Alliance for Jobs; Steven M. DeLucchi; and Mary O. DeLucchi, Plaintiffs,**

v.

**UNITED STATES FISH AND WILDLIFE SERVICE; Department of the Interior; Gale A. Norton, Secretary of the Interior; and Marshall P. Jones, Jr., Acting Director of the United States Fish and Wildlife Service, Defendants.**

Center for Biological Diversity, Defendant—Intervenor.

No. CVF01–5722AWISMS.

United States District Court, E.D. California.

May 9, 2003.

John C. Cruden, Acting Assistant Attorney General, Jean E. Williams, Section Chief, Seth M. Barsky, Assistant Section Chief, Lisa Lynne Russell, Trial Attorney, U.S. Department of Justice, Environment & Natural Resources Division, Wildlife & Marine Resources Section, Washington, DC, John K. Vincent, United States Attorney, Edmund Brennan, Assistant United States Attorney, Sacramento, CA, for Federal Defendants.

Deborah A. Sivas, Michael R. Lozeau, Earthjustice Legal Defense Fund, Stanford, CA, for Defendant–Intervenor Center for Biological Diversity.

Robin L. Rivett, M. Reed Hopper, David E. Haddock, Pacific Legal Foundation, Sacramento, CA, for Plaintiffs.

## MEMORANDUM OPINION AND ORDER RE PLAINTIFFS' MOTION FOR MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT

ISHII, District Judge.

This is an action for declaratory judgment and injunctive relief in which Home Builders Association of Northern California, California Chamber of Commerce, Construction Materials Association of California, Building Industry Legal Defense Foundation, California Alliance for Jobs, Steven M. DeLucchi, and Mary O. DeLucchi ("Plaintiffs") challenge the final designation or "rule" designating critical habitat for the Alameda whipsnake, *Masticophis lateralis euryxanthus,* issued by the United States Fish and Wildlife Service ("the Service"). *See* 62 Fed.Reg. 64306. The court has federal question subject matter jurisdiction over this action under 28 U.S.C. section 1331 and pursuant to the Administrative Procedures Act, 5 U.S.C. sections 701–706 (providing for judicial review of agency action).

Plaintiffs move for summary judgment, contending that the Service designated critical habitat for the Alameda whipsnake ("the snake") without adequate delineation of the area or sufficient analysis of the economic and other impacts of the designation in violation of the Endangered Species Act ("the ESA"), 16 U.S.C. sections 1531 et seq.; the Administrative Procedures Act ("the APA"), 5 U.S.C. sections 551, et seq.; the National Environmental Policy Act ("the NEPA"), 42 U.S.C. sections 4321, et seq.; the Regulatory Flexibility Act (the "RFA"), 5 U.S.C. sections 601, et seq.; and the Small Business Regulatory Enforcement Fairness Act ("the SBREFA"), 5 U.S.C. sections 801, et seq. Plaintiffs contend that the final rule designating critical habitat for the snake should therefore be overturned and remanded to the Service.

Defendants the Service; the Department of the Interior; Gale A. Norton, Secretary of the Interior; and Marshall P. Jones, Jr., Acting Director of the United States Fish and Wildlife Service ("Defendants") also move for summary judgment, contending that the final rule designating the habitat for the snake should be upheld,

but also arguing that the court should order a limited remand of the rule to the Service for reconsideration of the economic analysis required by the ESA in light of the decision in *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Service,* 248 F.3d 1277 (10th Cir.2001) and for revision of the legal descriptions of the seven critical habitat units designated by the Service.

## BACKGROUND

The Service formally proposed listing the snake as a threatened species under the ESA in 1994, 59 Fed.Reg. 5,3774 (Feb. 7, 1994), and published a final listing rule in 1997, 62 Fed.Reg. 64,306 (Dec. 5, 1997). The Service did not designate critical habitat for the snake at that time. Pursuant to the ESA, a designation of critical habitat is to be done concurrently with the listing. 16 U.S.C. sections 1533(a)(3)(A), 1533(b)(6)(C)(ii). Intervenor filed suit in 1999 in the United States District Court for the Northern District of California to compel the designation of the critical habitat for the snake, as well as six other species. *See Southwest Center for Biological Diversity, et al. v. United States Fish and Wildlife Service, et al.,* case no. CIV 99–1003 WHA. Pursuant to a settlement agreement in that case, the Service agreed to submit for publication in the Federal Register a proposal to withdraw the existing "not prudent" critical habitat designation for the snake, together with a new proposed critical habitat on or before March 1, 2000. *See* Exhibit A, Intervenors' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Voluntary Remand. The Service further agreed that if it determined that designation of critical habitat for the snake was prudent, it would, by September 1, 2000, submit for publication a final critical habitat designation for the snake and simultaneously withdraw the existing "not prudent" designation. *Id.* The September 1, 2000 deadline was subsequently extend-ed to September 22, 2000, by stipulation of the parties, and the final designation of critical habitat was published in the Federal Register on October 3, 2000. 65 Fed. Reg. 58,933. It is that final designation of critical habitat for the snake ("the Final Rule") that Plaintiffs challenge in this action.

## PROCEDURAL HISTORY

The complaint in this action was filed on June 7, 2001, and Defendants filed an answer on September 18, 2001. On October 19, 2001, the Center for Biological Diversity ("Intervenor") filed a motion to intervene as a matter of right pursuant to Rule 24(a), Federal Rules of Civil Procedure. In its moving papers, Intervenor explained that it had initiated the administrative and legal actions that led to the listing of the snake as a threatened species and to the designation of its critical habitat. The Magistrate Judge found that Intervenor met the four requirements for intervention of right and therefore granted Intervenor's motion. *See Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1061 (9th Cir.1997), *cert. denied,* 524 U.S. 926, 118 S.Ct. 2319, 141 L.Ed.2d 694 (1998) (the four requirements for intervention of right are timeliness, a significant protectable interest relating to the subject of the action, practical impairment of the intervenor's ability to protect that interest, and inadequate representation by the parties to the suit).

On February 22, 2002, Defendants filed a motion for voluntary remand, the stated basis for which was the Service's desire to voluntarily reconsider its designation of critical habitat for the snake in light of the decision in *New Mexico Cattle Growers Ass'n. v. U.S. Fish & Wildlife Service,* 248 F.3d 1277 (10th Cir.2001). Defendants sought an order from the court vacating the Final Rule, and Plaintiffs filed a brief

in support of Defendants' motion. Intervenor, however, opposed Defendants' motion. After taking the matter under submission on the papers, the court issued a Memorandum Opinion and Order denying Defendants' motion for voluntary remand, and holding as follows:

> In summary, the court finds that the Service has been unable to provide sufficient legal authority to support the method by which it is attempting to change a duly promulgated rule. Instead of utilizing the clearly established administrative procedures for amending or revising a rule, the Service, finding itself in a litigation posture, has conceded that the rule was not promulgated in compliance with ESA and asks the court to vacate the rule and remand the matter to it so that it can create a new rule. The court notes that this is not a case in which later-acquired information has caused the Service to rethink its decision. Rather, the Service's only stated reason for seeking this remand is the Service's own conclusion that its decision does not comply with a later-issued decision by the Tenth Circuit. Implicit throughout the Service's papers is the assumption that the existence of this decision makes the Alameda whipsnake critical habitat determination per se invalid or illegal. The Service even refers to its "duty to abide by recent judicial interpretations of the ESA." As stated above, the court finds that this assumption is faulty, for the obvious reason that this court is not within the Tenth Circuit. Further, the court finds that the existence of the Tenth Circuit opinion is insufficient to overcome the Service's duty to comply with the statutorily mandated procedures for revising or amending a critical habitat rule. In summary, the Service has failed to demonstrate that this court can properly remand an ESA rule to the Service without making a determination on the merits and without the Service complying with the statutory procedures for revising a rule.

Memorandum Opinion and Order Re Defendants' Motion for Voluntary Remand, July 2, 2002, 17:12—18:4.

On September 20, 2002, Defendants filed a "renewed" motion for remand, which Plaintiffs and Intervenor opposed. The court took the matter under submission without oral argument and denied the motion, finding as follows:

> In their original motion, Defendants asked the court to vacate the rule and then remand the matter to the agency. In their current motion, Defendants again ask the court to remand this matter, but ask the court to do so without vacating the current rule, thus allowing the current rule to stay in effect until a new rule is issued. The court finds that this change in the relief sought by Defendants does not address the basis of the court's prior decision.... The proposal by Defendants of remanding this matter without vacating the present rule does not remedy the defects in their original motion, as previously explained by the court... The court must find, therefore, as it did in regard to Defendants' original motion, that Defendants have failed to demonstrate that this court can properly remand an ESA rule without making a determination on the merits and without the United States Fish and Wildlife Service complying with the statutory procedures for revising a rule. *See generally, Greene v. Union Mutual Life Insurance Company*, 764 F.2d 19, 22 (1st Cir.1985) (requests for reconsideration of interlocutory decisions of the district court are subject to the complete power of the court rendering them to afford such relief as justice requires).

Memorandum Opinion and Order Re Defendants' Renewed Motion for Voluntary Remand, November 6, 2002, 3:2—4:3.

Now pending before the court are the cross motions for summary judgment by Plaintiffs and Defendants. Intervenor has filed points and authorities in opposition to Plaintiffs' motion and in support of Defendants' motion.

## LEGAL STANDARD

■ The review of a final agency action is governed by the APA under an "arbitrary or capricious" standard, thus an agency's decision should be overturned if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir.1995). The Ninth Circuit has explained the application of this standard as follows:

> Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (*Marsh*). We must determine whether the agency's decision was made after considering the relevant factors and whether the agency made a clear error of judgment. *Id.* at 378, 109 S.Ct. at 1861. We may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Dioxin/Organochlorine Center v. Clarke*, 57 F.3d 1517, 1521 (9th Cir.1995).

*Western Radio Services Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir.1996), *cert. denied*, 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996). In inquiring whether an agency's decision meets this standard, "we ask whether the agency 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Natural Resources Defense Council v. U.S. Depart. of the Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997) (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Depart. of the Navy*, 898 F.2d 1410, 1414 (9th Cir.1990)). Thus, the standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir.2000)(internal quotations omitted.).

Both of the original parties to this action seek summary judgment in their favor. Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.1984). In an action such as this, challenging the final decision of an administrative agency, the court does not utilize the standard analysis for determining whether a genuine issue of material fact exists. In *Occidental Engineering Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir.1985), Occidental brought an action challenging the denial by the Immigration and Naturalization ("INS") of its petition to reclassify one of its employees. The district court granted summary judgment to the INS and Occidental appealed. The Ninth Circuit held in part as follows:

Occidental contests the district court's grant of summary judgment on the grounds that there exist disputed issues of material fact. But there are no disputed facts that the district court must resolve. That court is not required to resolve any facts in a review of an administrative proceeding. Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. De novo factfinding by the district court is allowed only in limited circumstances that have not arisen in the present case. *See, e.g., Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Proietti v. Levi*, 530 F.2d 836, 838 (9th Cir.1976); *Dredge Corporation v. Penny*, 338 F.2d 456, 462 (9th Cir.1964). The appellant confuses the use of summary judgment in an original district court proceeding with the use of summary judgment where, as here, the district court is reviewing a decision of an administrative agency which is itself the finder of fact. In the former case, summary judgment is appropriate only when the court finds there are no factual issues requiring resolution by trial. In the latter case, summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.

In this case, the Administrative Record is before the court and there has been no indication by any party that de novo factfinding by the court is needed. Thus, what remains to be decided by the court is the legal issue of whether the Service acted appropriately and thus is entitled to judgment as a matter of law or whether, to the contrary, it failed to do so and Plaintiffs are entitled to judgment.

## CONTROLLING LAW

The first two stated purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). In order for a species to receive full protection under the ESA, it must be listed as "threatened" or "endangered." An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). When a species is listed as threatened or endangered, the Service has a duty, "to the maximum extent prudent and determinable," to concurrently, "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A). "Critical habitat" for an endangered or threatened species is defined in the ESA as follows:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

The ESA requires the Service to make the designation of critical habitat and

make revisions to the designation, "on the basis of the best scientific date available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). It gives the Service the discretion to exclude any area from critical habitat if the Service determines that "the benefits of such exclusion outweigh the benefits of specifying such an area as part of the critical habitat," unless it determines, "based on the best scientific and commercial data available," that to do so will result in the extinction of the species. 16 U.S.C. § 1533(b)(2).

Under the ESA, all federal agencies are required to consult with the Service, to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habit of such species," unless the agency has been granted an exemption. 16 U.S.C. § 1536(a)(2); *see also* 16 U.S.C. § 1536(a)(3) (requiring federal agencies to consult with the Service on any prospective agency action at the request of a prospective permit or license applicant).

The ESA also extends to persons, through prohibiting the "taking" of a designated endangered species. 16 U.S.C. § 1538(a)(1)(B). The term "take" under the ESA is defined as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" is defined within the Service's regulations to include an act that significantly modifies or degrades a species' habitat resulting in actual death or injury to the species. 50 C.F.R. § 17.3(c)(3). Although the "taking" provision in 16 U.S.C. section 1538(a)(1)(B) applies expressly only to "endangered spe-

cies", 16 U.S.C. section 1533(d) authorizes the Service to issue regulations prohibiting with respect to any "threatened" species any act prohibited under section 1538(a)(1). The Service has thereby extended the "taking" prohibition to all listed species, whether "threatened" or "endangered." 50 C.F.R. § 17.3 (2001).

## DISCUSSION

In support of their motion for summary judgment, Plaintiffs raise the following seven main contentions: I ) the Final Rule is invalid because the designation of critical habitat for the snake does not comport with the statutory definition of critical habitat; II ) the Service admits it failed to adequately evaluate the economic and other relevant impacts of designating critical habitat for the snake; III) the Service failed to provide the public adequate notice of the scope and nature of the critical habitat designation; IV) the Service failed to respond adequately to public comments; V) the Service failed to complete an adequate assessment of environmental impacts under the NEPA; VI) the Service failed to adequately conduct regulatory flexibility analysis as required by the RFA; and VII) the Service failed to adequately complete analysis required by the SBREFA. Each contention will be addressed in turn below.

### I. Whether Designation Comports with Statutory Definition of Critical Habitat

Plaintiffs contend that the Service has failed to complete the basic tasks required under the ESA to designate as critical habitat lands where members of the species in question are present. In lands occupied by members of the species, critical habitat is defined in the ESA as, "the specific areas within the geographical area occupied by the species, at the time it is

listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i).[1] Based on this definition, Plaintiffs argue that in order to designate the critical habitat for the snake, the Service must do the four following tasks: (1) identify the "physical or biological features" that are "essential to the conservation of the species;" (2) identify the "specific areas within the geographical area occupied by the species" where the essential "physical or biological features" are found; (3) determine that those "specific areas" where the essential features are found "may require some special management considerations or protection;" and (4) identify the "geographical area occupied by the species" at the time the species was listed. Plaintiffs contend that the Service has not adequately accomplished any of these necessary tasks. Finally, Plaintiffs also contend that the Service has not complied with the requirement under 16 U.S.C. section 1533(b)(2) that in designating the critical habitat for the snake, it consider "the best scientific and commercial data available."

## 1. Identification of physical or biological features essential to the conservation of the species

In regard to the first task, Plaintiffs argue that as a matter of simple logic, in order to identify the areas on which are found the "physical or biological features" that are "essential to the conservation of the species," the Service must identify what those physical or biological features are. Plaintiffs claim that in this case, the Service has failed to identify the essential physical or biological features in any

meaningful way. That is, Plaintiffs claim that it is impossible to determine from the Service's description in the Final Rule what physical or biological features are actually essential for the snake. Plaintiffs also complain that when the Service does attempt to describe habitat features that are actually needed by the snake, it does so in a way that is essentially useless, providing no way to determine how the various elements relate to each other.

Requirements as to how the Service is to identify essential physical or biological features are set forth in the following regulation:

> When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. *Known primary constituent elements shall be listed with the critical habitat description.* Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

50 C.F.R. § 424.12(b)(5)(emphasis added). The court finds, based on this language, that the Service uses the term "primary constituent elements" to describe those physical or biological features that are considered "essential to the conservation of the species," as that phrase is used in 16 U.S.C. section 1532(5)(A)(i).

Defendants contend that the Service specifically explained in the Final Rule why the lands in question were designated as essential. They rely on the following

---

**1.** In this case, in the Final Rule establishing the critical habitat for the Alameda whips-nake, the Service designates all the critical habitat lands as occupied by the snake.

language from the Final Rule, contending that it demonstrates that the critical habitat designation for the snake is consistent with the ESA regulations in 50 C.F.R. § 424.12:

> Within these areas, the primary constituent elements are those habitat components that are essential for the primary biological needs of foraging sheltering, breeding, maturation, and dispersal. The primary constituent elements are in areas that support scrub communities, including mixed chaparral, chamise-redshank chaparral, coastal scrub, and annual grassland and oak woodlands that lie adjacent to scrub habitats. In addition, the primary constituent elements for the Alameda whipsnake may be found in grasslands and various oak woodlands that are linked to scrub habitats by substantial rock outcrops or river corridors. Other habitat features that provide a source of cover for the whipsnake during dispersal or are near scrub habitats and contain habitat features (e.g., rock outcrops) that support adequate prey populations may also contain primary constituent elements for the Alameda whipsnake.

65 Fed.Reg. 58949.

In addition, Defendants list four particular types of environments—scrub communities, annual grasslands and oak woodlands, rock outcrops, and riparian corridors—and provide citations to portions of the Administrative Record wherein these environments are discussed in various outside references cited in the proposed critical habitat designation. *See* AR at 1895, 2057—2060, 1948 (scrub communities); AR at 1895, 2061–2064 (annual grasslands and oak woodlands); AR at 1895, 2061–2064 (rock outcrops); AR at 1895 (riparian corridors). Defendants claim that these portions of the Administrative Record can be linked to "the analysis of primary constituent elements as described in 50 C.F.R. § 424.12(b)." They argue that the inclusion of discussions of these four environments in the Administrative Record demonstrates that the Service's designation of critical habitat fulfilled the requirements of the ESA regulations and specifically addressed the primary constituent elements.

▄▄ Under the ESA, critical habitat for lands occupied by the species is defined in part as the specific areas on which are found "those physical and biological features [ ] essential to the conservation of the species." 16 U.S.C. § 1532(5)(A)(i). To state the same thing slightly differently, such lands designated as critical habitat must, under the ESA, contain physical and biological features essential to the conservation of the species. The court therefore finds as a matter of law that in order to designate the critical habitat for a species listed as threatened under the ESA in such lands, the Service must determine what physical or biological features are essential to the conservation of the species. This is tacitly acknowledged by the regulatory requirement in 50 C.F.R. section 424.12(b)(5), that "[k]nown primary constituent elements shall be listed with the critical habitat description." Clearly, if no primary constituent elements are known, the Service may not lawfully designate a critical habitat under the ESA.[2]

---

**2.** In their Reply in Support of Cross–Motion for Summary Judgment ("Reply"), Defendants contend, "the Service is not required to address PCEs in the Final Rule at all; rather, it is simply required to incorporate the PCE concept into its consideration of critical habi-

tat. 50 C.F.R. § 424.12(b)(5)." The court finds this contention to be meritless, as it directly contradicts the express requirement of 50 C.F.R. section 424.12(b)(5), that "[k]nown primary constituent elements shall be listed with the critical habitat description."

■ Applying this requirement to the designation of critical habitat at issue here, the court finds that it is impossible for the Service to comply without determining what physical and biological features are essential to the conservation of the snake. After reviewing the language from the Final Rule relied upon by Defendants, the court concludes that it does not provide the critical information. Rather, this language merely describes where the primary constituent elements may be located, using phrases in three of the four sentences indicating that the primary constituent elements "are in" or "may be found in" particular areas, or that particular habitat features "may also contain" the elements. Relatedly, in the first of the four sentences, the Service merely describes the primary constituent elements as essential for five primary biological needs. None of these sentences tell the reader what the primary constituent elements actually are. The court finds, therefore, that the language from the Final Rule relied upon by Defendants does not identify the physical or biological features which are essential to the conservation of the snake. Further, contrary to what is argued by Defendants, because the language does not identify these features, referred to by the Service as primary constituent elements, the language does not demonstrate that the critical habitat designation for the snake is consistent with the ESA regulations in 50 C.F.R. section 424.12. In regard to the four particular types of environment identified by Defendants, the court finds as an initial matter that 50 C.F.R. section 424.12(b) does not describe primary constituent elements. Rather, it contains a non-exclusive list of special management considerations or protections that may be required by physical and biological features that are essential to the conservation of a species.[3] The court finds, therefore, that Defendants' attempt to tie the inclusion of the discussions of these environments to the factors in section 424.12(b), even if successful, does not show that these four environments were considered by the Service to be primary constituent elements. More significant, however, is the fact that Defendants do not provide a citation to any part of the Final Rule in which the Service identifies these four environments as essential for the conservation of the species or as primary constituent elements. Counsel may not now attempt to read into the Service's decision a thought process that is not demonstrated by the Final Rule itself. "Because the central focus of the arbitrary and capricious stan-

---

3. 50 C.F.R. section 424.12(b) provides as follows:

(b) In determining what areas are critical habitat, the Secretary shall consider those physical and biological features that are essential to the conservation of a given species and that may require special management considerations or protection. Such requirements include, but are not limited to the following:
(1) Space for individual and population growth, and for normal behavior;
(2) Food, water, air, light, minerals, or other nutritional or physiological requirements;
(3) Cover or shelter;
(4) Sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and generally,

(5) Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.
When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

dard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'' *U.S. v. Garner,* 767 F.2d 104, 116–17 (5th Cir.1985) (quoting *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Finally, in their Reply, Defendants contend that the Service identified specific areas that contained the biological or physical characteristics essential to the snake, and that these primary constituent elements "included availability of lizards for prey, small mammal burrows and rock outcroppings for breeding and shelter, and grasslands for nesting," citing 65 Fed.Reg. 58935–36 and AR at 1895 and 2057–2064. The court notes initially that the pages of the Administrative Record cited by Defendants contain copies of a document entitled, "Alameda Whipsnake Survey Rossmoor Neighborhood Four Mitigation Area," AR at 1895, and a graduate thesis entitled, "Aspects of the Ecology of the Alameda Whipsnake," AR at 1950—2096. While the Service may have relied on these documents, neither of them provides a statement by the Service of the biological or physical features essential to the conservation of the snake.

The first citation provided by Defendants, 65 Fed.Reg. 58935–36, includes a portion of the Final Rule entitled, "Primary Constituent Elements," which provides as follows (emphasis added):

> Under section 3(5)(A)(i) of the Act and regulations at 50 CFR 424.12, we are required to base critical habitat determinations on the best scientific and commercial data available and to consider those physical and biological features that are essential to conservation of the species and that may require special management considerations or protec-

tion. Such requirements include, but are not limited to, space for individual and population growth, and for normal behavior; food, water, air, light, minerals, or other nutritional or physiological requirements; cover or shelter; sites for breeding, reproduction, or rearing of offspring, germination, or seed dispersal; and habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.

The primary constituent elements for the Alameda whipsnake are those habitat components that are essential for the primary biological needs of foraging, sheltering, breeding, maturation, and dispersal. The primary constituent elements are in areas that support scrub communities, including mixed chaparral, chamise-redshank chaparral, coastal scrub, and annual grassland and oak woodlands that lie adjacent to scrub habitats. In addition, the primary constituent elements for the Alameda whipsnake may be found in grasslands and various oak woodlands that are linked to scrub habitats by substantial rock outcrops or river corridors. Other habitat features that provide a source of cover for the whipsnake during dispersal or are near scrub habitats and contain habitat features (e.g., rock outcrops) that support adequate prey populations may also contain primary constituent elements for the Alameda whipsnake. **Within** these communities, Alameda whipsnakes require plant canopy covers that supply a suitable range of temperatures for the species' normal behavioral and physiological requirements (including but not limited to foraging, breeding, and maturation). Openings in the plant canopy or scrub/grassland edge provide sunning and foraging areas. Corridors of plant cover and retreats (including rock outcrops) sufficient to provide for dispersal between areas of habitat, and

plant community patches of sufficient size to prevent the deleterious effects of isolation (such as inbreeding or the loss of a subpopulation due to a catastrophic event) are also essential. Within these plant communities, specific habitat features needed by whipsnakes include, but are not limited to, small mammal burrows, rock outcrops, talus, and other forms of cover to provide temperature regulation, shelter from predators, egg laying sites, and winter hibernaculum. Many of these same elements are important in maintaining prey species. Adequate insect populations are necessary to sustain prey populations.

The court finds that the initial portion of this excerpt essentially duplicates the language relied upon by Defendants in their initial Memorandum, with additional new language beginning at the word "[w]ithin" highlighted above. A carefully reading of this additional language reveals that it, like the portion originally relied upon by Defendants, does not identify the physical or biological features essential to the conservation of the snake in a meaningful way. While the Service explains that "Alameda whipsnakes require plant canopy covers that supply a suitable range of temperatures for the species' normal behavioral and physiological requirements," it does not explain what such a suitable range of temperatures would actually be or what the snake's normal behavioral and physiological requirements are. Likewise, although the Final Rule describes as "essential" "[c]orridors of plant cover and retreats (including rock outcrops) sufficient to provide for dispersal between areas of habitat, and plant community patches of sufficient size to prevent the deleterious effects of isolation (including but not limited to foraging, breeding, and maturation)," it provides no information as to how much of a corridor of plant cover or retreat is "sufficient," or what size of a plant community patch is "sufficient." Further, al-

though the Final Rule states that "[a]dequate insect populations are necessary to sustain prey populations," it does not define either "adequate" or "prey populations."

■ Finally, nowhere in this list of primary constituent elements set forth in the Final Rule does the Service cite "lizards for prey" or "grasslands for nesting"as referred to by Defendants in their Reply. The most definitive statement provided by the Service is that "[w]ithin these plant communities, specific habitat features needed by whipsnakes include, but are not limited to, small mammal burrows, rock outcrops, talus, and other forms of cover to provide temperature regulation, shelter from predators, egg laying sites, and winter hibernaculum. Many of these same elements are important in maintaining prey species." Although this statement references the "small mammal burrows" and "rock outcroppings" referred to by Defendants, the statement describes habitat features "needed" by the snake. As set forth above, the ESA requires the Service to identify physical or biological features "essential to the conservation of the species." 16 U.S.C. § 1532(5)(A)(i). The court finds that it is unclear whether the term "need" used in this context is meant to be synonymous with the term "essential," particularly in light of the use elsewhere in the same paragraph of the term "essential" in reference to corridors of plant cover and retreats. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–7, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)("[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action."). Thus, the court concludes that this statement does not amount to an identification of the features "essential to the conservation of the species," as required under the ESA.

In addition to contending that the Service failed to identify any particular physi-

cal or biological features that are essential to the conservation of the species, Plaintiffs make the related contention that the Service failed to adequately determine why any particular physical or biological features are essential, because the Final Rule does not describe any method for determining how or when the snake can be considered conserved. Defendants do not respond to this argument.

▮ As set forth above, critical habitat for occupied land is defined in part under 16 U.S.C. section 1532(5)(i), as specific areas "essential to the conservation of the species." Under 16 U.S.C. section 1532(3), "conservation" is defined for the purposes of the ESA as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." The court finds, therefore, that because essential physical or biological features must be essential for "the conservation of the species," they must be necessary to bring the species, "to the point at which the measures provided pursuant to [the ESA] are no longer necessary." The court concludes, as Plaintiffs argue, that if the Service has not determined at what point the protections of the ESA will no longer be necessary for the snake, it cannot possibly identify the physical or biological features that are an indispensable part of bringing the snake to that point.

▮ In light of the above, the court must conclude that the Service has failed to identify within the Final Rule the physi-

cal or biological features essential to the conservation of the species, a required element of occupied land designated as critical habitat under 16 U.S.C. section 1532(5)(A)(i). The Service's designation of critical habitat for the snake was therefore in violation of the ESA, and Plaintiffs are entitled to judgment as a matter of law on this issue.

### 2. Specific areas where the essential features are found

In regard to the second task identified by Plaintiffs as necessary in designating as critical habitat lands occupied by the species, Plaintiffs contend that the Service failed to identify "the specific areas within the geographical area occupied by the species" on which the "essential physical or biological features" are found, "as set forth in the definition of "critical habitat" under 16 U.S.C. section 1532(5)(A)(i). Plaintiffs argue that to the contrary, the Final Rule makes it clear that the Service designated areas as critical habitat which it knew did not contain essential physical or biological features. Specifically, Plaintiffs claim that the Service admits in the Final Rule that it was unable to map critical habitat in sufficient detail to exclude areas that it knows are unlikely to contribute to Alameda whipsnake conservation.[4] Plaintiffs also argue that the Final Rule states expressly that features such as buildings, roads, canals, railroads, and large bodies of water are included within the critical habitat designation, even though the Service admits that they do not contain, nor are expected to develop, habitat components, and do not contain one or more of the primary constituent elements.[5] Further, Plaintiffs claim

---

4. The Final Rule provides in part under the heading "Methods":

> In identifying areas of critical habitat, we attempted to avoid developed areas unlikely to contribute to Alameda whipsnake conservation. Given the short period of time in which we were required to complete this

rule and the lack of fine-scale mapping data, we were unable to map critical habitat in sufficient detail to exclude all such areas.

65 Fed.Reg. 58936.

5. The Final Rule provides in part under the heading "Methods":

that the Service acknowledges that there are areas within the critical habitat boundaries that do not contain essential habitat components.[6] Finally, Plaintiffs argue that the record shows that the Service ignored comments it received from members of the public indicating that areas within the critical habitat boundaries were not in fact critical habitat.

■ The court finds that as Plaintiffs argue, a specific geographical area cannot be both "essential to conservation" of the snake so as to amount to critical habitat and also "unlikely to contribute to Alameda whipsnake conservation." Thus, the court finds that the passage quoted in footnote four regarding designation as critical habitat a geographic area unlikely to contribute to snake conservation is, in fact, an admission that some areas within the critical habitat boundary are not actually critical habitat. Likewise, the court finds that the passage in footnote five regarding inclusion of features such as buildings, roads, canals, railroads, and large bodies of water that do not contain "habitat components" or "one or more of the primary constituent elements" within the critical habitat boundary is an admission that the Final Rule designates as critical habitat areas that actually do not qualify as critical habitat under the ESA. This is further confirmed by the statement that federal actions limited to these areas "would not trigger a section 7 consultation." *See* 16 U.S.C. § 1536(a)(2). Finally, the court finds that in the language quoted in footnote six, the Service implicitly states that it included within the critical habitat boundary areas that are "likely to develop" essential habitat components, but do not contain them now. Yet, the ESA defines critical habitat for the area occupied by the species as the specific areas on which *are* found the features essential to the conservation of the species. 16 U.S.C. § 1532(5)(A)(i).

Defendants contend that the critical habitat designation excludes areas with features and structures not possessing the necessary primary constituent elements, making three arguments. First, Defendants argue that under the "exclusion criteria," if particular properties within the designated critical habitat have features or structures that do not contain at least one of the primary constituent elements, "then the property is not critical habitat at all." Defendants define the "exclusion criteria" as comprising the following language from the Final Rule:

> 3. Critical habitat does not include existing features and structures, such as buildings, roads, railroads, large water bodies, and similar features and structures not containing one or more of the primary constituent elements.

65 Fed.Reg. 58949, C.F.R. § 17.9(c). Defendants claim that later case-by-case review under Section 7 consultation pro-

---

Existing features and structures within the critical habitat boundary, such as buildings, roads, canals, railroads, large water bodies, and other features not currently containing or likely to develop these habitat components, will not contain one or more of the primary constituent elements. Federal actions limited to these areas, therefore, would not trigger a section 7 consultation, unless they affect the species and/or primary constituent elements in adjacent critical habitat.
*Id.*

**6.** Plaintiffs cite to 65 Fed.Reg. 58,944, which falls within a section of the Final Rule entitled, "Summary of Comments and Recommendations" which the Service responds to a public comment in part with the following language:

> Within the proposed critical habitat boundaries, only areas that contain or are likely to develop those habitat components essential for the primary biological needs of the Alameda whipsnake may be subject to section 7 consultation should a Federal nexus exist in those areas.

cedures would reveal that based on the exclusion criteria the property was not critical habitat. *See* 16 U.S.C. § 1536(a)(2)(requiring federal agencies to consult with the Secretary of the Service to insure that any action authorized, funded or carried out by the agency is not likely to result in the destruction or adverse modification of the critical habitat of species listed as threatened or endangered under the ESA). Second, Defendants argue that Plaintiffs argue for an impracticable level of certainty in regard to the designation of the critical habitat, claiming generally that the Service's interpretations of the ESA and its own regulations regarding primary constituent elements are entitled to deference from the court. *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 514, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (holding that the interpretation by the Secretary of Health and Human Services of language in a regulation governing reimbursement of provider hospitals for costs of certain educational activities was entitled to deference). Third, Defendants argue that the Service's use of a "narrative exclusion of certain lands" from the critical habitat for the snake is supported by the ESA, the record, and the best scientific data available, and the court should defer to the Service's judgment, particularly given the equivocal evidence. *See Central Arizona Water Conservation Dist. v. EPA,* 990 F.2d 1531, 1539 (9th Cir.), *cert. denied,* 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993).

■■■ The court finds that Defendants are incorrect in arguing that under the exclusion criteria, land that has features or structures that do not contain one of the primary constituent elements "is not critical habitat." The exclusion criteria, quoted above, excludes only "features and structures," not the land on which they are located. Thus, Defendants' dependence on the exclusion criteria to filter out land

which should not be included in the critical habitat unwarranted. Further, the court finds considerable merit to Plaintiffs' contention that the language from the Final Rule quoted above indicates that the Service has relied upon the Section 7 consultation process to justify critical habitat designation without actually identifying the specific areas where essential habitat features are found. Essentially, the Service states that the consideration of what specific areas contain features essential to the conservation of the snake is deferred to a later time. Nothing in the ESA permits the Service to defer the assessment of where the essential habitat features are found until consultation under Section 7 of the ESA is required. To the contrary, such a procedure contradicts the express language of the ESA that critical habitat comprises "specific areas" where "physical or biological features" "essential to the conservation of the species" "*are found.*" 16 U.S.C. § 1532(5)(A)(i)(emphasis added). Further, the Service is required to "designate any habitat of such species which is *then* considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(emphasis added). Although Defendants argue that Plaintiffs demand an unreasonable level of certainty in designating the critical habitat and that the court should defer to the Service's judgment, the court cannot do so when the Service has acted in direct violation of the statute.

■■■ Based on all of the above, the court finds that Plaintiffs are correct in contending that the Service designated as critical habitat areas that it knew did not contain essential physical or biological features. The court thus concludes that the Service has failed to identify within the Final Rule the specific areas within the geographic area occupied by the snake on which physical or biological features essential to the conservation of the species are found, a required element of occupied land

designated as critical habitat under 16 U.S.C. section 1532(5)(A)(i). The Service's designation of critical habitat for the snake was therefore in violation of the ESA, and Plaintiffs are entitled to judgment as a matter of law on this issue.

■ In addition to arguing that the Service designated areas as critical habitat which it knew do not contain essential physical or biological features, Plaintiffs contend that the Service violated 16 U.S.C. section 1532(5)(A)(i), by failing to designate an area smaller than the entire geographical area occupied by the snake. This statute, which defines critical habitat, refers to "specific areas within the geographical area occupied by the species." *See also* 16 U.S.C. § 1532(5)(C) ("[e]xcept in those circumstances determined by the Secretary, critical habitat shall not include the entire geographic area which can be occupied by the threatened or endangered species."). Plaintiffs argue that the Final Rule does not contain any finding supporting a determination by the Secretary that the designation of critical habitat needed to "include the entire geographical area which can be occupied" by the snake, and that the Service was therefore required to consider whether designation of an area smaller than the entirety of occupied habitat would be sufficient to conserve the snake.

Plaintiffs argue that rather than complying with this requirement, the Service designated as critical habitat for the snake all areas that it found to be "suitable," maintaining that the entirety of this expanse is "occupied by the Alameda whipsnake." *See* 65 Fed.Reg. 59,936; 58,942. Plaintiffs claim that the nothing in the record indicates that the Service fulfilled its obligation to consider whether designation of a smaller area within this geographic area would be sufficient to conserve the snake.

Defendants contend to the contrary that they did not designate as critical habitat the entire area that can be occupied by the species, and that the Administrative Record shows that some areas that may presently or could in the future contain the primary constituent elements were excluded. Specifically, Defendants argue that the Administrative Record shows that Alameda whipsnakes were sighted in some locations that were not included in the critical habitat, citing one example. *Compare* sighting # 16, AR at 2048 with mapped area in Final Rule, 65 Fed.Reg. 58952. Defendants also argue that despite the fact that scientific literature identified all of Alameda and Contra Costa Counties as Alameda whipsnake habitat, the Service designated only part of these counties as critical habitat. *Compare* AR at 1888 with Final Rule, 65 Fed.Reg. 58949–62. Based on Defendants' arguments, the court finds that the Service designated as critical habitat less than the entire area that can be occupied by the snake and thus did not violate the letter of the law on this issue. Defendants are thus entitled to judgment on this issue.

*3. Whether specific areas may require special management considerations or protection*

■ In regard to the third task identified by Plaintiffs as necessary in designating occupied critical habitat, Plaintiffs contend that such critical habitat may not be designated unless the Service determines that the areas designated contain physical or biological features that "may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). Plaintiffs argue that because the Service is required to articulate a "reasonable connection between the facts found and the choice made," *Natural Resources Defense Council*, 113 F.3d at 1124, the Service must explain why any given area requires "special management considerations or protection," providing reasons to support

its conclusion. Plaintiffs claim that neither the Final Rule nor the Administrative Record provides these reasons.

In response, Defendants first argue that the word "may" indicates that this is not a mandatory, present feature of the area, but rather that the specific area has features which, in the future, could benefit from additional protection, which adds to the justification for including a specific area as critical habitat. Further, Defendants contend that the critical habitat designation took into account special management considerations and protections. Specifically, Defendants argue that the record demonstrates that significant threats to the snake exist, especially due to urban development and fire suppression activities. Defendants claim that in response to these threats, the Service considered whether "the habitats needed by the Whipsnake may require special management considerations." As an example, Defendants claim that the supplemental information accompanying the Final Rule noted that effects of the critical habitat designation included requiring federal agencies to engage in Section 7 consultations, a process that would address these threats. Defendants also argue that the Administrative Record shows that the Service addressed activities such as land and water management, recreation, and construction management, all of which could affect the snake, and that these activities may require "special management considerations." Defendants admits the Final Rule does not include specific management recommendations, which were left to "recovery plans" and "other mechanisms." Defendants stress, however, that the Service "clearly evaluated whether the Whipsnake habitat may require special management considerations or protection," and so fulfilled the ESA's requirements.

Intervenor argues that the Service did determine that the designated habitat may require special management considerations or protection, referring to several different findings by the Service, including findings that several different kinds of federally approved activities may destroy existing snake habitat.

 The court agrees with Defendants that the word "may" within the phrases "may require special management considerations or protection" indicates that it is not mandatory that this be a present feature of the area. The court does find, however, that under the express language of the statute, particularly the use of the conjunction "and," it is mandatory that the specific area designated have features which, in the future, may require special consideration or protection. The court must therefore agree with Plaintiffs that the fact that the Service "took into account" or "considered" whether the specific areas designated as critical habitat in the Final Rule may require special management considerations and protections is insufficient. What Defendants argue, in essence, is that the Service considered whether specific activities, carried out by various governmental entities on the land designated as critical habitat, might require special management considerations. What the Service was required to do, however, was different. It was required to make a finding, prior to designating a particular area as critical habitat, that the area in question might require special management considerations and protections at some time in the future. Nothing in Defendants' arguments point the court to an indication in the Final Rule or Administrative Record that the Service made that finding prior to the designation of the critical habitat or that it was a factor in the designation.[7] The court therefore con-

---

7. For example, the portion of the Final Rule cited by Defendants on this issue, 65 Fed.Reg.

cludes that in regard to this issue, the Service has not complied with this statutory requirement that under 16 U.S.C. section 1532(5)(A)(i). The Service's designation of critical habitat for the snake was therefore in violation of the ESA, and the court will grant Plaintiffs judgment on this issue.

### 4. Identification of the geographic areas occupied by the species

In regard to the third task identified by Plaintiffs as necessary in designating as critical habitat lands where members of the species are present, Plaintiffs contend that in order to determine the "specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features . . . essential to the conservation of the species," under 16 U.S.C. section 1532(5)(A)(i), the Service must identify "the geographic area occupied by the species." Plaintiffs contend that in this case, the Service has entirely failed to satisfy this requirement, because the record does not support the Service's conclusion that areas designated as critical habitat are "occupied" by the species.

■■■ The term "occupied" is not defined in the ESA. "When terms used in a statute are undefined, [the Court] give[s] them their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995). "Occupy" is defined as "to take up residence in: settle in," "to hold possession of," and "to reside in as an owner or tenant." *Webster's Third New International Dictionary* 1561 (1993). Plaintiffs claim that under these definitions, a geographical area is "occupied" by a species

only if that species resides there. They find support for this claim in 50 C.F.R. section 424.12(e)(2002), which provides:

> (e) The Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species.

Plaintiffs argue reasonably that this provision equates "the geographical area presently occupied by a species" with the species' "present range." *See* 50 C.F.R. § 17.11(e)(220) (stating that "[t]he 'historic range' indicates the known general distribution of the species or subspecies as reported in the current scientific literature.").

In support of their contention that the Administrative Record does not support the Service's conclusion that the geographic areas designated as critical habitat are occupied by the snake, Plaintiffs claim that the Service admits in the Final Rule that it does not know where the snake is located. *See* 65 Fed.Reg. 58,936 ("To date, only initial research has been done to identify and define specific habitat needs of Alameda whipsnakes, and no comprehensive surveys have been conducted to quantify their distribution or abundance.") Plaintiffs further claim that the Service admits that its determinations of which areas were "occupied" by the Snake were made not on the basis of the species actually being present, but rather on the basis of the presumed suitability of habitat. *See id.* at 58,941–42 ("[W]e used data on known Alameda whipsnake locations to initially identify important areas. We have also

---

58938–39, consists of a list of various activities set forth to comply with the requirement under Section 4(b) of the ESA that the agency provide a description of "those activities involving a Federal action that may destroy or

adversely modify such habitat or that may be affected by such designation." There is no indication that these activities led to the designation of the specific area as critical habitat.

made the reasonable assumption that areas adjacent to these locations are also within the geographical area occupied by the species based on the suitability of habitat."). Furthermore, Plaintiffs claim that the Service also considered movement corridors to be occupied by the snake on a basis less than its physical presence. *See id.* at 58,941 ("[i]n addition, knowledge of the species biology and the need for the genetic connectivity to assure species persistence directs the inclusion of movement corridors where possible").

Based on the above-quoted language from the Final Rule, Plaintiffs contend that the Service's interpretation of the term "occupied" ignores the distinction between occupied and unoccupied lands and therefore renders 16 U.S.C. section 1532(5)(A) a nullity. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001))(holding that "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"). Plaintiffs argue that the term "occupied" cannot be so liberally construed that it would permit geographical areas to be deemed "occupied" by a species merely because the Service believes that the species needs them. Plaintiffs note that the ESA permits unoccupied lands to be designated as critical habitat "upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). They argue that if occupied lands could be designated as critical habitat on the same basis, there would be no purpose in having different requirements for occupied and unoccupied areas.

In addition to the above contentions, Plaintiffs contend that in this case, the Service identified as "occupied" geographic areas where it actually knew that the snake was not present, initially citing the Swaim study relied upon by the Service for its understanding of the snake. They argue that many of the sites where Swaim found no whipsnakes were apparently designated as critical habitat and thus deemed "occupied" by the Service. Plaintiffs also cite information from other private parties indicating that the snake was not present in locations the Service ultimately included as part of the critical habitat.

Separately, Plaintiffs contend that the Service's use of the term "occupied" also violates the ESA because it is not based on conditions at the time of listing. *See* 16 U.S.C. § 1532(5)(A) (requiring that occupancy be based on conditions at the time of listing). Specifically, Plaintiffs claim that the Final Rule cites telemetry work done in 1994 and claims that the distribution of the species can be determined by referencing studies completed in 1983 and 1985. *See* 65 Fed.Reg. 58933. Plaintiffs argue that the Final Rule shows no effort to ensure that areas identified as "occupied" in the Final Rule were actually occupied by members of the species in 1997, when the snake was listed as threatened. Thus, argue Plaintiffs, the Final Rule defines "occupied" areas as areas that *have been* occupied, in violation of what the ESA requires.

Defendants argue that the Service had more than sufficient support in the record to show that the areas designated as critical habitat are within the geographic area occupied by the species. They agree with Plaintiffs' definition of the term "occupied" as synonymous with the word "present," but argue that the requirement of occupation or presence is not a requirement for absolute certainty. Defendants argue that "while the Service may not know *exactly* where Whipsnakes are found, uncertainty

does not mean that a designated area is not critical habitat," and that the Service must be given latitude to exercise its expertise, review the best scientific information available and reach reasonable conclusions that the snake is present in specific areas, particularly in light of the elusive, secretive nature of the snake. In regard to the corridors that connect some of the critical habitat units, Defendants argue that the Service applied its expertise to conclude that "the corridors were essential to the conservation of the species and contained necessary primary constituent elements." They also argue that the snake was actually sighted within Unit # 6, one of the corridors, and that the scientific literature identifies Unit # 7, as "within the geographic range of the species."

■ The court must agree with Plaintiffs that the approach taken by the Service threatens to eliminate the statutory distinction between "areas within the geographic area occupied by the species at the time it is listed," and "specific areas outside the geographic area occupied by the species at the time it is listed ... [that] are essential to the conservation of the species," both of which may be designated as critical habitat under 16 U.S.C. section 1532(5)(A). Thus while Defendants are correct in arguing that uncertainty as to exactly where the snake may be found does not mean that a designated area is not critical habitat, at some point such uncertainty makes it an abuse of discretion for the Service to designate the land as occupied under section 1532(5)(A)(i).

■ Defendants attempt to portray this as a situation in which Plaintiffs simply disagree with the Service's experts. The court finds, however, that there is more substance to the issue. For example, as a partial explanation for why the Service included certain lands described as "corridors" within the occupied critical habitat, Defendants state that "the corri-

dors were essential to the conservation of the species and contained necessary primary constituent elements." The court must find as a matter of law that this is an insufficient basis to designate land as occupied critical habitat under the ESA. To do otherwise would be to nullify the distinction between occupied and unoccupied land, a distinction Congress expressly included within the ESA. *See* 16 U.S.C. § 1532(5)(A)(i) and (ii).

■ Further, Defendants ask the court to defer to the Service's expertise in designating the critical habitat as a whole as occupied, arguing as a basis for its decision that it used the best scientific information available. But nowhere do Defendants directly address Plaintiffs' claim that specific information was available to the Service that some of this land was not, in fact, occupied by the snake. That is, Defendants do not refer the court to particular parts of the Administrative Record showing that the Service had and considered information directly contrary to that cited by Plaintiffs. The court is therefore left in the position of wondering as to the basis of the Service's decision. While the court is mindful of the requirement that it give great deference to the decisions of the Service, the court is required to determine whether the Service considered relevant facts and articulated a rational connection between the facts found and the choice made. *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Marsh*, 490 U.S. at 377, 109 S.Ct. 1851. Here, the Service has articulated no rational connection between the information cited by Plaintiffs, which was in the Administrative Record and thus available to the Service, and the Service's decision to include the areas in question within the designated occupied critical habitat. The court cannot

defer to the Service's decision when a basis for that decision is not provided. *See Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (court cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals); *see also SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)("[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action."). In this case, the court must conclude that in light of Defendants' failure to articulate a rational reason for including the areas in question within the occupied critical habitat in the face of the evidence to the contrary, it was an abuse of discretion for the Service to do so.

■ Defendants also argue that the critical habitat designation identifies specific lands with as much detail as possible. They explain that the Service used pictorial maps and narrative legal land descriptions with sections, townships and ranges in designating the critical habitat for the snake. Using these two methodologies, seven critical habitat "units" were defined in the Final Rule, based on the actual locations of five different populations (Units 1 –5) and two narrow connectivity corridors (Units 6 and 7). 65 Fed.Reg. 58950–58962; 50 C.F.R. § 17.95(c). Seven maps, which were published in the Federal Register and included in the Final Rule, identify each of the seven units of critical habitat using landmarks. *Id.* Defendants argue that the Service's overall approach to mapping of critical habitat remains sound, but admit that there are errors in the critical habitat legal descriptions, explaining as follows:

> These technical errors related to discrepancies found between the boundaries on the critical habitat maps and how those boundaries were translated into the legal descriptions that accompany the maps. Because the Service only first discovered these technical error late in the period of preparing this summary judgment motion, it has not had sufficient time to fully assess the scope of these errors. At this time, the Service believes that the errors do not undermine the Service's conceptual methodology—the use of Whipsnake sighting data, aerial and digital photos, and GIS technology to develop maps of critical habitat remains a reasonable methodology. Nevertheless, a remand of the Final Rule will enable the Service to ensure that its legal descriptions are entirely consistent with the mapped boundaries and accurately reflect the changes to the proposed rule that were discussed in the Final Rule. *See e.g.* 65 Fed.Reg. 58945 ("Summary of changes from the Proposed Rule").

Defendants' Opposition, 13: 2–12.

In their Reply, Defendants discuss the two aspects of the designation of the critical habitat which they previously acknowledged contained errors: the economic analysis and the legal description of the critical habitat. They argue that these matters require remand, and explain as follows:

> The second matter requiring remand is the legal description of critical habitat. Although the methodology by which the pictorial map was developed based upon the best available scientific information and remains accurate, technical errors were made when that map was converted into a narrative legal description. In particular, the Service has admitted that although the biology behind the mapping exercise remains valid, the narrative legal descriptions contain some ambiguities that make it unclear where, exactly, the critical habitat boundary is in some cases. *See Declaration* at p.3, ¶ 5. If

this Final Rule is remanded to the Service, the error will be corrected by modifying the mapped boundaries and the legal descriptions using Geographic Information Systems technology and an overlay map of $100 \times 100$ meter squares. *Id.* at p. 4, ¶ 6.

On this matter, vacatur of the Final Rule may be appropriate. The decision as to whether or not to vacate a critical habitat rule depends upon the seriousness of the error and its disruptive consequences. *Building Industry Legal Defense Foundation v. Norton,* 231 F.Supp.3d 100, 104–108 (D.D.C.2002). In this case, until these changes are complete, some property owners in the regulated community will remain unsure as to whether there [sic] property is inside or outside of the critical habitat boundaries, because different interpretations of the legal descriptions can produce extremely different results. *Declaration* at p.3, ¶ 5. While the § 7 consultation process and the exclusion criteria (or more precisely, the "non-inclusion" criteria) [footnote omitted] in the Final Rule would allow the Service to determine, on a case-by-case basis, whether a given parcel was or was not critical habitat, the § 7 consultation process can also place additional regulatory burdens on a landowner, as Plaintiffs note. *Plaintiffs' Initial Memorandum* at 42–43. And, as previously explained to the Court, if the Final Rule is vacated, no harm to the Whipsnake is anticipated, because the protections of the ESA §§ 7, 9 and 10 remain in place. *Federal Defendants' Memorandum in Support of Motion for Voluntary Remand* (Feb. 21, 2002) pp. 13 –15. Accordingly, this Court should vacate the Final Rule. *See National Ass'n of Home Builders v. Norton,* 2001 WL 1876349 (D.Ariz., Sept. 21, 2001); *but see NRDC, et al. v. Department of the Interior,* Civ. No. 99–

5246(SW) (C.D.Cal. June 12, 2002), previously filed in *Defendant–Intervenor's Notice of Supplemental Authority* (June 21, 2002) and attached to *Federal Defendants' Memorandum in Support of Renewed Motion for Voluntary Remand* (October 28, 2002).

Defendants' Reply, 2:18—4:2.

The court will thus grant Plaintiffs judgment on this issue and remand the Final Rule to the Service for the purpose of revising the legal description of the critical habitat.

5. *Consideration of best scientific data available*

 As a final main argument in support of their contention that the Final Rule is invalid because the designation of critical habitat for the snake does not comport with the statutory definition of critical habitat, Plaintiffs argue that the Service failed to consider the best scientific data available. *See* 16 U.S.C. § 1533(b)(2) (designation of critical habitat shall be "based on the best scientific and commercial data available"). Plaintiffs claim that in this case, although the Service was provided with significant biological information indicating that many areas within the boundaries of the proposed critical habitat units did not contain essential physical or biological features, there is no evidence in the record suggesting that the biological information was considered. Plaintiffs provide the three following specific examples. First, Plaintiffs cite information submitted by biologists Greg Martinelli and Darren Wiemeyer about a habitat assessment that had concluded that the Faria Ranch and Freitas Ranch "do not possess adequate and necessary habitat features that are critical to Alameda whipsnake survival." AR at 819. Second, Plaintiffs cite comments from Karen Swaim, who conducted a study of the snake in 1994, stating that

some properties within the existing habitat areas had been surveyed for the snake with negative results. AR at 157. Third, Plaintiffs refer to information from Terry Huffman that a habitat assessment was done by biological consultant Gary A. Beeman, which indicated that the snake was not present at the site on Lackland Drive, and that critical habitat existed only "on the northeast corner." AR at 839–46. Plaintiffs argue that the Service did not address these findings in the Final Rule, and did not exclude the referenced areas from the designated critical habitat.

In response, Defendants contend that the Administrative Record shows that the Service considered the best scientific data available at the time of its decision. They contend that the 7 volume, 2100 page Administrative Record in this case demonstrates that the Service considered a vast range of information, including public comments and peer review, AR at 729–1891; scientific journals, AR at 1875–1917; and a graduate thesis, AR at 1950–2096. They argue specifically that Plaintiffs cite no data that the Service failed to include in the Administrative Record. Defendants claim that the Service's reliance on the data in the Administrative Record complied with its obligation to use the best scientific date available, and the agency's conclusion based upon that data and the scientific expertise of the agency's biologists deserves deference under the applicable standard. In response to Plaintiffs' argument that the Service failed to address specific information, Defendants contend that "the Service, the expert agency charged with administration of the ESA, already reviewed that data, rendered its own interpretation, and made its decision," but provide no citation to the Administrative Record demonstrating that the Service considered the particular information cited to by Plaintiffs.

Defendants note that they readily admit in the supplemental information accompanying the Final Rule that there are gaps in the best scientific data available. *See* 65 Fed.Reg. 58936. Defendants argue, however, that Plaintiffs cannot meet their burden of showing that the Service's decision was not rationally connected to the facts on the record, because even if the evidence is not dispositive, the decision is not unreasonable because the Service considered the relevant factors and based its decision upon expert analysis of the available data. *See Fishermen's Dock Co-op. v. Brown,* 75 F.3d 164, 172 (4th Cir.1996) ("often 'the available data do not settle a regulatory issue, and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion' ")(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Intervenor makes the same general arguments as Defendants.

 Plaintiffs rely on *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989), in which the Ninth Circuit held that "[i]n light of the ESA requirement that the agencies use the best scientific and commercial data available to insure that protected species are not jeopardized, 16 U.S.C. § 1536(a)(2), the USFWS cannot ignore available biological information." The section of the ESA referenced, 16 U.S.C. section 1536(a)(2), sets forth the requirements to be adhered to by agencies in insuring that "any action authorized, funded, or carried out by such agency" complies with the ESA. Thus, it does not directly address the issue here, *i.e.,* the designation of critical habitat for a species by the Service. However, in this context, the court finds no meaningful distinction between the "best scientific and commercial data available" standard under

section 1536(a)(2) and the "best scientific data available" standard under section 1533(b)(1)(a) in regard to designating critical habitat. The court concludes, therefore, that the Service cannot simply ignore available biological information in designating critical habitat for the snake.

Defendants do not deny that the Service did not contradict or refute the three specific examples of information referred to by Plaintiffs and noted above. Nor do they deny that the Service, in writing the Final Rule, did not exclude these areas where this available biological information indicated that essential physical or biological features did not exist or the snake was not present. Defendants argue simply that the Service reviewed the data and rendered its own decision in regard to it. Again, as with the issue of designating geographic areas as occupied by the snake, the court is left in the position of wondering as to the basis of the Service's decision. *See Baltimore Gas,* 462 U.S. at 105, 103 S.Ct. 2246; *Marsh,* 490 U.S. at 377, 109 S.Ct. 1851. The Service provides no rational connection between the information cited by Plaintiffs, which was available to the Service, and the Service's decision to include the areas in question within the critical habitat. The court cannot defer to the Service's decision when a basis for that decision it is not provided. *See Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Therefore, the court must conclude that in light of Defendants' failure to articulate a rational reason for including the areas in question within the critical habitat, it was an abuse of discretion for the Service to do so.[8] The court will therefore grant Plaintiffs judgment on this issue.

## II. Evaluation of Economic Impacts

Plaintiffs contend that the Service failed to adequately evaluate the economic impacts of designating the critical habitat for the snake. Specifically, Plaintiffs argue that the Service used a method of economic analysis which was subsequently held to be improper in *New Mexico Cattle Growers v. U.S. Fish and Wildlife Service,* 248 F.3d 1277 (10th Cir.2001). Plaintiffs claim that because of its reliance on this approach, the Service failed to consider many significant economic impacts which do exist. Plaintiffs also argue that the Service failed to adequately balance the benefits of including areas within the critical habitat designation against the benefits of excluding them.

■■■ Under the ESA, the Service is required to "designate any habitat of such species which is then considered to be critical habitat" "concurrently with making a determination ... that a species is an endangered species or a threatened species." 16 U.S.C. § 1533(a)(3)(A). Although the listing of the species and the designation of its critical habitat are to occur concurrently under the ESA, they are two distinct processes for which Congress established distinct standards. Under 16 U.S.C. section 1533(b)(1)(A), the Service must make the decision to list a species as endangered or threatened "sole-

---

**8.** In response to Defendants' arguments, the court emphasizes that it is in no way implying that the Service should have gathered more information. *See Southwest Center for Biological Diversity v. Babbitt,* 215 F.3d 58, 60 (D.C.Cir.2000) ("The 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies."). Likewise, the court is not weigh-

ing and resolving conflicting expert opinions. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

ly on the basis of the best scientific and commercial data available," and thus cannot take into consideration the economic impacts of listing. In contrast, the designation of critical habitat is to be made "on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Further, the Secretary of the Service "may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id.*

In *New Mexico Cattle Growers,* the Tenth Circuit reviewed the Service's analysis of economic impacts associated with a critical habitat designation ("CHD") for the Southwestern willow flycatcher. The Tenth Circuit explained the analysis done by the Service ("FWS") as follows:

> The Endangered Species Act ("ESA"), which controls CHDs, requires the FWS to perform an economic analysis of the effects of the CHD before making a final designation. 16 U.S.C. § 1533(b)(2). In order to determine what the "economic impact" of a CHD will be, the FWS has adopted an incremental baseline approach (the "baseline approach"). The baseline approach utilized by the FWS is premised on the idea that the listing of the species (which will occur prior to or simultaneously with the CHD) will have economic impacts that are not to be considered. The primary statutory rationale for this position comes from 16 U.S.C. § 1533(b)(1)(A), which states that listing determinations be made "solely on the basis of the best scientific and commercial data available." Thus, the baseline approach moves any economic

impact that can be attributed to listing below the baseline and, when making the CHD, takes into account only those economic impacts rising above the baseline. Using the baseline approach, the FWS determined that the flycatcher CHD resulted in no economic impact, stating that "[c]ritical habitat designation will ... result in no additional protection for the flycatcher nor have any additional economic effects beyond those that may have been caused by listing and by other statutes." Division of Economics, U.S. Fish and Wildlife Service, Economic Analysis of Critical Habitat Designation for the Southwestern Flycatcher, S3 (1997).

*New Mexico Cattle Growers,* 248 F.3d at 1280. The Tenth Circuit found that "[t]he crux of the statutory dispute is in determining the meaning of 'economic impact' in 16 U.S.C. Section 1533(b)(2)." *Id.* at 1283. Under the baseline approach adopted by the Service, "unless an economic impact would not result but for the CHD, that impact is attributable to a different cause (typically listing) and is not an 'economic impact ... of specifying any particular area as critical habitat.'" *Id.* The Tenth Circuit defined the issue as whether the Service "must analyze all of the economic impacts of critical habitat designation (regardless of whether the impacts are co-extensive with other causes), or only those impacts that are a 'but for' result of the CHD." *Id.* at 1284.

The Tenth Circuit found that the Service had a long held policy position that CHDs were "unhelpful, duplicative, and unnecessary," and that this policy position developed from the regulations promulgated by the Service defining the meaning of both the "jeopardy standard," applied in the context of listing, and the "adverse modification standard" applied in the context of designating critical habitat. *Id.* at 1283; *see* 50 C.F.R. section 402.02. The court

found that under these regulations, the two standards are defined as virtually identical, or, if not identical, one (adverse modification) is subsumed by the other (jeopardy). *Id.* Consistent with its policy position, the Service found that the impacts of the flycatcher listing and the flycatcher CHD were co-extensive. Thus, the Service stated in its economic analysis that because all actions "that result in adverse modification of critical habitat will also result in a jeopardy decision, designation of critical habitat for the flycatcher is not expected to result in any incremental restrictions on agency activities." *Id.* at 1283–84.

The Tenth Circuit concluded as follows:

The statutory language is plain in requiring some kind of consideration of economic impact in the CHD phase. Although 50 C.F.R. 402.02 is not at issue here, the regulation's definition of the jeopardy standard as fully encompassing the adverse modification standard renders any purported economic analysis done utilizing the baseline approach virtually meaningless. We are compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation. *Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Compensation Programs,* 927 F.2d 1150, 1153 (10th Cir.1991) ( "We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous."). Because economic analysis done using the FWS's baseline model is rendered essentially without meaning by 50 C.F.R. § 402.02, we conclude Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes. Thus, we hold the baseline approach to economic analysis

is not in accord with the language or intent of the ESA.

*New Mexico Cattle Growers,* 248 F.3d at 1285.

The primary basis for Defendants' Motion for Voluntary Remand in the present case was that the approach the Service had utilized for evaluating the economic impacts related to critical habitat designation was "substantially similar" to that utilized by the Service in *New Mexico Cattle Growers.* That is, the economic analysis for the critical habitat designation for the snake was performed using an approach where the economic effects that were considered included only those effects incremental to the critical habitat designation. 65 Fed.Reg. 58945. The Service did not examine the effects of the critical habitat designation that were co-extensive with those of listing the snake as threatened, and concluded that "no economic impacts are expected from critical habitat designation above and beyond that already imposed by listing the Alameda whipsnake." 65 Fed.Reg. 58945. In their motion, Defendants argued that the holding in *New Mexico Cattle Growers* should be followed in this case, and that the Service was required to "reconsider the economic effects of designating critical habitat for the snake using a method other than the baseline method struck down by the Tenth Circuit." Defendants therefore sought a voluntary remand of the rule in its entirety, explaining as follows: "This process will result in FWS re-evaluating which areas contain the physical and biological features essential for the conservation of the species, and whether those features require special management considerations. Then FWS will then [sic] conduct the economic analysis, utilizing a new methodology calculated to meet the concerns voiced in *New Mexico Cattle Growers.*" Defendants did not explain what this "new methodology" is. As set forth above, the court denied Defendants' motion for voluntary

remand and renewed motion for voluntary remand on the ground that Defendants had failed to demonstrate that this court could properly remand an ESA rule to the Service without making a determination on the merits and without the Service complying with the statutory procedures for revising a rule.

Now, Defendants do not oppose Plaintiffs' motion for summary judgment to the extent that it challenges the economic analysis for the critical habitat designation. To the contrary, Defendants expressly state that, "the Service concedes that, based upon recent caselaw, the economic analysis in the Whipsnake critical habitat rule was in error," and that "[a] remand for the limited purpose of readdressing the economic analysis will enable the Service to resolve Plaintiffs' concerns." Defendants conclude, therefore, that assuming that this court finds the Tenth Circuit's interpretation of the ESA requirement of an economic analysis is correct and that the Service's economic analysis in connection with the critical habitat for the snake deficient for the same reasons found in *New Mexico Cattle Growers*, "the appropriate remedy would be for this Court to remand the Whipsnake critical habitat designation to the agency for the limited purpose of revising the economic analysis to comply with the ESA, its regulations, and recent case law." Defendants suggest that the court should proceed with the remand without further consideration of Plaintiffs' economically based claims. Neither in their present opposition nor in their original motions do Defendants provide any discussion of how the analysis in the *New Mexico Cattle Growers* case is correct in light of the controlling statutes.

Intervenor, however, does oppose Plaintiffs' motion to the extent it challenges Defendants' economic analysis, claiming that the analysis fully complies with the ESA. Intervenor contends that the incremental "baseline approach" to preparing the economic analysis for the critical habitat designation is the only one that comports with the plain language of ESA, as set forth in 16 U.S.C. section 1533(b)(2), which expressly provides that (1) the listing decision must be based solely on best scientific and commercial date available and (2) the designation of critical habitat should consider the economic impact of specifying any particular area as critical habitat. It also argues that the analysis adopted in *New Mexico Cattle Growers* is at odds with the intent of Congress that economic considerations have no relevance to the decision to list a species under the ESA. *See* H.R.Rep. No. 97–567, pt. 1, at 29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2820. Intervenor argues that there is no point in calculating the costs that would be caused by both critical habitat designation and listing because listing must occur regardless of costs. It argues further that the only role an economic analysis may play is to assess the incremental costs, above and beyond the costs associated with listing, of specifying particular areas for the protection conferred by critical habitat designation. Thus, it concludes that as a matter of statutory interpretation, legislative intent, and sound policy consistent with the overarching mandate of the ESA, the baseline approach to analyzing the economic impacts of critical habitat designation is the only correct one. Intervenor concludes that because Plaintiffs have challenged only this baseline approach, but not the underlying regulations, the court is free to deny Plaintiffs' motion and enter judgment for Defendants.[9]

9. As a final point, Intervenor suggests that if this court is "troubled by the inconsistencies that concerned the Tenth Circuit," the proper course would be to strike down, as inconsistent with the statute, the implementing regulations that give rise to this problem. This

Intervenor speculates that a remand of the snake critical rule to comply with the interpretation set forth in *New Mexico Cattle Growers* could lead to the exclusion of areas from the critical habitat on the ground that the economic impacts from listing and critical habitat designation outweigh the benefits of including these areas in the rule. *See* 16 U.S.C. § 1533(b)(2). Intervenor argues that this would thwart Congressional intent to conserve and recover listed species through the designation of critical habitat unless the costs of that additional protection outweigh the benefits.

Intervenor also argues that including the economic impacts of listing in the analysis under section 1533(b)(2) will have one of two possible effects—either it will make it impossible for the Service to separate the costs associated exclusively with specifying particular areas as critical habitat from the costs of listing and thus thwart the very purpose of the requirement, or, if the Service does manage to separate out the costs of listing, it will serve no purpose, because the Service has no discretion to act in any way upon the costs associated exclusively with listing a species.

In so arguing, Intervenor proceeds from a false premise. Nothing in *New Mexico Cattle Growers* legitimizes consideration, while designating critical habitat, of economic impacts attributable solely to listing

a species under the ESA. Rather, the Tenth Circuit defined the issue before it as "whether the [Service] must analyze all of the economic impacts of critical habitat designation (regardless of whether the impacts are co-extensive with other causes), or only those impacts that are a 'but for' result of the [critical habitat designation]." *Id.* at 1284.

■■■ Plaintiffs contend that Intervenor is mistaken in arguing that requiring the Service to consider all the economic impacts of designating critical habitat will necessarily lead the Service to improperly consider economic facts during the listing process. The court agrees. As Plaintiffs argue, the ESA does not prohibit the Service from assessing the economic impacts of listing a species as threatened or endangered, but only prohibits those assessments from forming a basis for the listing decision.

As long as the Service does not rely on its analysis of economic impacts in deciding whether to list a species, collecting the information and evaluating it in designating a critical habitat does not violate the ESA. The Tenth Circuit, in addressing the issue, opined that "[r]equiring that the [Service] comply with the intent of the legislative body by considering economic impacts at a point subsequent to listing does not inject economic considerations

was done in *Sierra Club v. U.S. Fish and Wildlife Service,* 245 F.3d 434 (5th Cir.2001). In that case, the Fifth Circuit found the definition of the destruction/adverse modification standard set forth in 50 C.F.R. section 402.02 to be facially invalid because of the "manifest inconsistency" between it and Congress's unambiguously expressed intent that the Service elect not to designate a critical habitat only in rare or limited circumstances. The problem with Intervenor's argument is that while the Sierra Club expressly challenged the regulation in *Sierra Club v. U.S. Fish and Wildlife Service,* Plaintiffs in the present case do not challenge the underlying regulation. It is

worth noting, however, that the Tenth Circuit recognized the existence of the *Sierra Club v. U.S. Fish and Wildlife Service* decision in *New Mexico Cattle Growers,* 248 F.3d at 1283 at note 2, stating that the regulations were not before the court, and providing as follows:

FN2. Though these regulatory definitions are not before us today, federal courts have begun to recognize that the results they produce are inconsistent with the intent and language of the ESA. *See, e.g., Sierra Club v. U.S. Fish and Wildlife Service,* 245 F.3d 434 (5th Cir.2001) (holding that the adverse modification standard of 50 C.F.R. 402.02 is inconsistent with the ESA).

into the listing process, but rather situates those considerations in precisely the spot intended by Congress." *New Mexico Cattle Growers,* 248 F.3d at 1285. The court finds that Plaintiffs are correct in arguing that because Congress has required that the Service consider economic impacts, this court must presume that the Service can do so without compromising its duty to list species, "solely on the basis of the best scientific and commercial date available" as required under 16 U.S.C. section 1533(b)(1)(A).

After reviewing the parties' arguments and related authorities at great length, the court must conclude that in light of the Service's policy position expressed in 50 C.F.R. section 402.02 defining the jeopardy standard used in listing as fully encompassing the adverse modification standard used in designating critical habitat, an approach to economic analysis that eliminates consideration of the impacts with multiple causes makes the requirement for economic analysis meaningless. The court also concludes that the Tenth Circuit was correct in finding in *New Mexico Cattle Growers,* that "Congress intended that the FWS conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." *Id.* at 1285. Accordingly, the court will grant Plaintiffs judgment on this issue and will remand the Final Rule to the Service to conduct a new economic analysis under the ESA in accordance with the reasoning set forth in *New Mexico Cattle Growers.*

### III. and IV. Notice to Public and Response to Public Comments

Plaintiffs contend that the Service failed to comply with the notice requirements under the ESA regarding the proposed critical habitat for the snake. They argue that in the proposed rule, the Service provided only general information about the scope of the critical habitat area, and did not expressly define specific primary constituent elements or identify where these elements are located within the designated critical habitat area. Further, Plaintiffs argue that the Service did not draw precise boundaries or clearly identify those areas the Service claims will not be deemed critical habitat, although they have been included within the critical habitat boundaries. Plaintiffs' arguments thus echo those they make in regard to the substance of the Final Rule.

Plaintiffs rely on 16 U.S.C. section 1533(b)(5), which requires the Service to provide notice to the public regarding any proposal for critical habitat designation. Specifically, it requires that the Service publish a general notice and the complete text of the proposed rule in the Federal Register, give actual notice to State agencies and counties or equivalent jurisdictions, give notice to appropriate professional scientific organizations, and publish a summary of the proposed rule in a newspaper of general circulation. Plaintiffs further rely on section 553(b) and (c) of the APA, incorporated in the ESA by reference. *See* 16 U.S.C. § 1533(b)(4). Section 553(b) provides specifically that the notice shall include:

1) a statement of the time, place and nature of public rule making proceedings;

2) reference to the legal authority under which the rule is proposed; and

3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

The Ninth Circuit has held, where proposed rulemaking was conducted in accordance with the APA and other environmental laws, "notice is adequate if it is sufficient to provide the public with a

meaningful 'opportunity to comment on [the proposed] provisions' ... and 'allows interested parties to offer informed criticism and comments.'" *Hall v. U.S. EPA,* 273 F.3d 1146, 1162 (9th Cir.2001) (quoting *Ober v. EPA,* 84 F.3d 304, 316 (9th Cir. 1996) and *Conn. Fund for the Env't, Inc. v. EPA,* 696 F.2d 179, 185–86 (2nd Cir.1982)) (internal punctuation, citations and quotation marks omitted). In this case, Plaintiffs contend that the Service failed to provide a clear statement of the scope of the "critical habitat" and so deprived interested individuals with a meaningful opportunity for comment. Plaintiffs argue that the notice of the proposed critical habitat designation was therefore legally deficient and the final rule is invalid.

On March 8, 2000, the Service published the proposed rule for the critical habitat designation for the snake, entitled, "Endangered and Threatened Wildlife and Plants; Proposed Determination of Critical Habitat for the Alameda Whipsnake (Masticophis lateralis euryxanthus)." Deadlines and contact information for submission of public comments were included. 65 Fed.Reg. 12155–56. The ESA was cited as legal authority for the proposed rule. The proposed rule provided in part that, "We [the Service] solicit data and comments from the public on all aspects of this proposal, including data on economic and other aspects of the designation." 65 Fed. Reg. 12155. The proposed rule identified and explained the various types of habitat in which the snake had been found, including rock outcroppings, scrub communities, and grasslands. *Id.* at 12156, 12158–59. Under a section entitled "Effects of Critical Habitat Designation," the proposed rule further provided a list of Federal agency activities that could be affected by the designation of critical habitat. *Id.* at 12161–62. The proposed rule included graphical map depictions of the regions affected, named counties, and described the potentially affected property using sec-

tions, townships and ranges. A subsequent notice issued on May 15, 2000, reopened the public comment period, further described the counties affected, and announced two public hearings to be held in San Ramon, California. 65 Fed.Reg. 30951. In light of these procedures, Defendants contend that the Service complied with the notice requirements under section 1533(b)(5) in regard to the proposed critical habitat designation..

The court finds that the Administrative Record in this case demonstrates that as Defendants argue, the Service complied with the notice requirements for the proposal for the critical habitat designation for the snake to the extent of the timing and method of giving notice. However, the court further finds that to the extent that the court has found the Final Rule deficient in that it does not comport with the statutory definition of critical habitat, the court must also find that the notice provided by the Service in regard to the proposed rule deprived the public of a meaningful opportunity to comment and to offer informed criticism and comments. *See Hall.* Accordingly, the court concludes that the notice provided by the Service in this case was inadequate under the ASA and the ESA, and thus will grant Plaintiffs judgment on this issue.

Plaintiffs also contend that the Service failed to adequately respond to many significant public comments that would require substantial change in the designation of "critical habitat" for the snake. The APA provides that [a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a

concise general statement of their basis and purpose. " 5 U.S.C. § 553(c). Plaintiffs argue that significant comments require an adequate response, and then specify several areas of public comment to which Plaintiffs believe the Service failed to adequately respond. These include: 1) comments that the snake was not found in specific areas within the proposed critical habitat; 2) comments that the boundaries of the critical habitat were unclear; 3) comments that the primary constituent elements are uncertain; 4) comments that empirical evidence shows specific areas are not actual or suitable habitat; and 5) comments that existing uses of the critical habitat will not interfere with the survival of the snake. Plaintiffs contend that each of these claims, if true, would require a change in the Final Rule and therefore warranted a substantive response, which they claim the Service did not provide.

The Ninth Circuit has explained as follows in regard to an agency's duty to respond to public comments:

> [A]n agency need only respond to "significant" comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule. *Home Box Office v. FCC*, 567 F.2d 9, 35 & n. 58 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). The failure to respond to comments is grounds for reversal only if it reveals that the agency's decision was not based on consideration of the relevant factors. *Thompson v. Clark*, 741 F.2d 401, 409 (D.C.Cir.1984).

*American Mining Congress v. U.S. EPA*, 965 F.2d 759, 771 (9th Cir.1992).

The Administrative Record in this case indicates that hundreds of pages of public comment were considered and oral comments from 45 people were heard by the Service. AR at 729–1871, 65 Fed.Reg. 58940. The Service summarized and responded to these public comments in 6 pages of the supplemental information to the Final Rule. 65 Fed.Reg. 58939–945. Defendants contend that these pages demonstrate that the Service gave more than adequate consideration to the public comments made in response to the proposed rule. First, Defendants argue that public comments that the snake was not present in various areas proposed for designation as critical habitat were responded to in their Responses to Comments (1i) and (1k) in the Final Rule. They further argue that, as the Service explained in its response, live trapping surveys, sightings of the snake or hybrid relatives, reasonable assumptions, the need for future genetic connectivity and movement corridors, and the absence of other more comprehensive data all supported the Service's more protective approach to critical habitat designation. 65 Fed.Reg. 58941; AR at 2048, 1368, 1876, 1883.

Second, Defendants argue that public claims that the critical habitat designations were vague were considered by the Service in Response to Comments (3b) and (4c). They further argue, that as set forth above, the Service indicated in the Final Rule that roads, waterways, landmarks and legal descriptions associated with the critical habitat were all identified. 65 Fed. Reg. 58942.

Third, Defendants argue that public concerns regarding the uncertainty of the primary constituent elements were considered in Response to Comment (1a). They further argue that the Service acknowledged some uncertainties, but relied upon historic range and Whipsnake surveys. AR at 1888, 1914, 1949, 2048, 1894, 2097.

Fourth, Defendants argue that public comments related to the effects of critical habitat designation upon existing uses such as hiking, horseback riding, and cycling, were considered in Response to

Comment (1e). Defendants also argue that in the Final Rule, the Service noted that these activities do not pose the same threat to habitat as construction of new trails, and that recovery plans and management plans would address any unique concerns that emerge. 65 Fed.Reg. 58941.

Based on its review of the Responses to Comments section of the Final Rule, the court finds that the Service's responses to public comment on the proposed rule were minimally legally adequate under the standard set forth in *American Mining Congress*. That is, the Service responded to the "significant" comments as the term is defined therein. Defendants are thus entitled to judgment on this issue. The correctness of the Service's responses is a separate issue, and is addressed indirectly above in terms of the court's conclusions in regard to the Service's compliance, in drafting the Final Rule, with the statutory definition of critical habitat.

## V. EA and EIS Requirement Under NEPA

■ Plaintiffs contend that the Service failed to complete an adequate assessment under the NEPA, because it did not prepare an Environmental Assessment ("EA"), 40 C.F.R. section 1508.9, or an Environmental Impact Statement ("EIS"), 40 C.F.R. section 1508.11. *See* 42 U.S.C. § 4332(C). In *Douglas County v. Babbitt*, 48 F.3d 1495, 1507 (9th Cir.1995), *cert. denied* 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996), the Ninth Circuit held that the EA and EIS requirements of the NEPA do not apply to the designation of critical habitat under the ESA, explaining as follows:

> [W]e find that NEPA does not apply to the Secretary's decision to designate a habitat for an endangered or threatened species under the ESA because (1) Congress intended that the ESA critical habitat procedures displace the NEPA requirements; (2) NEPA does not apply

to actions that do not change the physical environment; and (3) to apply NEPA to the ESA would further the purposes of neither statute.

Plaintiffs acknowledge the *Douglas County* decision, but invite the court to revisit the issue in light of the decision in *Catron County Board of Commissioners v. U.S. Fish and Wildlife Service*, 75 F.3d 1429 (10 Cir.1996), in which the Tenth Circuit reached the opposition conclusion and held that the designation of critical habitat under the ESA is subject to the EA and EIS requirements of the NEPA. Plaintiffs state that this claim is raised in order to preserve it for appeal.

It would, of course, be clear error for this court to consider the Tenth Circuit's ruling on an issue on which there is contrary Ninth Circuit authority on point. Accordingly, the court will reject Plaintiffs' contention that the Service failed to conduct an adequate assessment under the NEPA, and will grant Defendants judgment on this issue.

## VI. Regulatory Flexibility Act Analysis

Plaintiffs contend that the Service failed to adequately conduct the regulatory flexibility analysis required by the RFA, 5 U.S.C. sections 601, *et seq.* The RFA requires the Service to conduct an analysis of the impact of its ruling on small entities if the action will have a "significant economic impact on a substantial number of small entities." 5 U.S.C. § 605. In this case, because of its reliance on the baseline standard, the Service concluded that the final rule was "not expected to result in any restrictions in addition to those currently in existence." 65 Fed.Reg. 58, 947. Thus, the Service concluded that the designation of the critical habitat for the snake would not have "a significant effect on a substantial number of small entities," and

therefore did not conduct an analysis under the RFA. Plaintiffs contend that because the Service's regulatory flexibility analysis depends upon its use of the baseline standard, the analysis is flawed and thus invalid.

In response, Defendants argue that a remand of the Final Rule for reconsideration of the economic analysis under *New Mexico Cattle Growers* would enable the Service to ensure that the RFA is properly considered, if it is applicable. Defendants conclude, therefore, that it is unnecessary for the court to address the merits of Plaintiffs' claims regarding this statute and provide no analysis of this claim.

In its separate response, Intervenor contends that the Service properly determined that the designation of critical habitat would not have a significant impact on a substantial number of small entities. Intervenor argues that Plaintiffs' argument to the contrary is incorrect because it is based solely on their conclusion that the baseline approach to economic analysis is inappropriate, a conclusion that Intervenor disputes.

As discussed above, the court will remand the Final Rule to the Service to conduct a new economic analysis. The regulatory flexibility analysis conducted by the Service in regard to the designation of the critical habitat for the snake derived from that economic analysis. Thus, a new economic analysis will require the Service to also conduct a new regulatory flexibility analysis. Accordingly, the court finds it unnecessary to address the Service's prior conclusion under the RFA. The court will grant Plaintiffs judgment on this issue.

### VII. Small Business Regulatory Enforcement Fairness Act Analysis

Plaintiffs contend that the Service failed to adequately complete the analysis required by the SBREFA, which provides that before any final rule can take effect, the Service must provide Congress with both a report indicating whether the rule is a major rule and a cost-benefit analysis of the rule. 5 U.S.C. §§ 801, *et seq.* A "major rule" is one that will likely result in (1) an annual effect on the economy of $100 million or more; (2) a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies, or geographic regions; or (3) any significant adverse effects on competition, employment, investment, productivity, innovation, or ability of United States-based enterprises to compete with foreign-based enterprises. 5 U.S.C. § 804(2).

In this case, the Service's expert concluded, based on the Service's use of baseline economic analysis, that the designation of the critical habitat for the snake would not cause any of these four results. Plaintiffs contend that to the contrary, the designation of critical habitat for the snake is a "major rule," again relying on their contention that the baseline economic analysis was improper.

In response, Defendants argue as with the RFA that a remand of the Final Rule for reconsideration of the economic analysis under *New Mexico Cattle Growers* would enable the Service to ensure that the SBREFA is properly considered. Defendants argue, therefore, that it is unnecessary for the court to address the merits of Plaintiffs' claims regarding this statute. Defendants provide no analysis of the merits of Plaintiffs' claims regarding compliance with SBREFA.

In its separate response, Intervenor contends that the Service properly determined that the designation would not create the necessary economic impacts to require reports under the SBREFA. That is, the Service's conclusion, based on its baseline economic analysis, was that the

designation will not bring about any of the results that would cause the rule to be designated a major rule. 65 Fed.Reg. 58,-947; AR at 713.

As it did in regard to the RFA, the court finds that the analysis done by the Service in accordance with the SBREFA was derived from the economic analysis it did under the ESA. Therefore, the court finds it unnecessary to address the Service's conclusion under the SBREFA, and will grant Plaintiffs judgment on this issue.

## VIII. Conclusions

Defendants contend that in designating the critical habitat for the snake, their analysis was macro-level, looking at the geography of an entire region and using the best scientific information available to designate specific areas as critical habitat. They characterize Plaintiffs' challenge to the designation as insisting on an unreasonable and unworkable amount of precision and detail on all aspects of designating the critical habitat, from specifying the geographic area involved to identifying essential biological or physical features. Defendants' arguments can be accurately summarized as claiming that they did the best they could with the limited resources available to them, that no more is required from them under the ESA and the APA, and the court should defer to the Service's expertise in these matters.[10]

As appealing as this portrayal of the case might be, as the court as explained above, there is much more to Plaintiffs' arguments than a general demand for more detail. Initially, Plaintiffs contend that the Final Rule is invalid because the designation of critical habitat for the snake does not comport with the statutory defini-

tion of critical habitat for lands occupied by members of the species of, "the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). As detailed above, the court concludes that despite its discussion of where such features may be found, the Service has failed to actually identify what features are essential to the conservation of the species, and, relatedly, has failed to explain why any particular features at all are essential. Second, the court has concluded that the Service has knowingly designated as critical habitat areas that do not now contain essential physical or biological features, improperly relying on the exclusion criteria and the Section 7 consultation process to form a basis to exclude these areas at a later time. The court has found, however, that the Service acted properly in designating less than the entire area that can be occupied by the snake. Third, the court has concluded that the Service failed to properly consider the prerequisite that land designated as critical habitat may require special management considerations or protection, and instead considered this issue after it had designated the critical habitat.

Fourth, on the issue of identification of the geographic areas occupied by the species at the time of listing, the court has found that the approach taken by Defendants fails to adequately distinguish between areas "within the geographic area occupied by the species" and "areas out-

---

**10.** The court is unpersuaded by Defendants' complaints about the short time they had to complete the Final Rule, in light of the fact that the Final Rule listing the snake under the ESA was published in 1997. *See* 16 U.S.C.

§ 1533(a)(3)(A)(designation of any habitat than considered to be critical shall be done concurrently with listing the species as endangered or threatened).

side the geographic area occupied by the species," as set forth in 16 U.S.C. section 1533(5)(A)(i) and (ii). Further, the court will grant Defendants' request that the court remand the Final Rule to allow the Service to make corrections in the admittedly defective narrative legal descriptions of the critical habitat. Fifth, in regard to the requirement that the Service use the best scientific and commercial data available, the court has found that the Service failed to articulate any rational basis for including certain areas within the critical habitat, and therefore abused its discretion in doing so.

Plaintiffs' second major contention is that the Service failed to adequately evaluate the economic impacts of designating the critical habitat for the snake. Relying on the Tenth Circuit's reasoning in *New Mexico Cattle Growers,* Defendants concede that the economic analysis in regard to the critical habitat designation for the snake was in error. As set forth above, the court finds the Tenth Circuit's reasoning persuasive.

In regard to Plaintiffs' third and fourth major contentions, the court has concluded that because the designation of the critical habitat for the snake did not comport with the statutory definition of critical habitat, the notice provided to the public was inadequate under the APA and the ESA. It has found, though, that the Service's responses to the comments were minimally legally sufficient.

Finally, the court has found that Defendants are correct that in light of controlling Ninth Circuit authority, no EA or EIS was required under the NEPA for the critical habitat designation. However, due to their concession that their economic analysis under the ESA was faulty, Defendants have also essentially conceded that their analysis under the RFA and the SBREFA must be reconsidered.

Thus, sympathetic as the court may be to the constraints under which the Service operates, it cannot simply accept the Service's assurances that it has done all that is required of it and the court should defer to the judgment of its experts. As outlined above, the court has found substantive defects in the designation of the critical habitat for the snake which go beyond the issue of the degree of detail required or differing opinions.

## IX Remand and Vacatur

 Plaintiffs contend that in light of the unlawful nature of the Final Rule, the appropriate remedy in this case is to vacate the entire Final Rule and remand it to the Service. "Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid." *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d at 1405 (citing *Western Oil and Gas v. U.S. EPA,* 633 F.2d 803, 813 (9th Cir.1980)). "However, when equity demands, the regulation can be left in place while the agency follows the necessary procedures." *Id.* Factors to be considered on this issue include the following:

In determining whether an agency's action should be vacated or not pending rectification of a procedural flaw, the Court must consider (1) the purposes of the substantive statute under which the agency was acting, (2) the consequences of invalidating or enjoining the agency action, and (3) and potential prejudice to those who will be affected by maintaining the status quo. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402–03, 94 L.Ed.2d 542 (1987). In addition, the Court must consider the magnitude of the administrative error and how extensive and substantive it was.

*Endangered Species Committee of the Building Industry Association v. Babbitt,* 852 F.Supp. 32, 41 (D.D.C.1994). Plaintiffs argue that in this case, vacating the Final Rule will not frustrate the purposes of the ESA and the consequences will not be severe. As set forth above, the first two stated purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

Plaintiffs argue, based on the Declaration of Defendants' expert, that if the Final Rule is vacated, the conservation needs of the snake will be adequately provided for through the other protections of the ESA. Declaration of Gary Frazer, 4 ("past consultation history and our understanding of probable future consultation outcomes suggest that the existence of critical habitat has not added significantly to the protection of the whipsnake, and that vacating the critical habitat rule during the remand will not impede its conservation."). Plaintiffs contend that in contrast, those who own land and operate businesses within the critical habitat boundary face significant burdens if the Final Rule remains in place during the remand period. Plaintiffs base their contention on the Section 7 consultation process required when a proposed project has a "federal nexus" and the permit requirements under Section 10.

As set forth above, Defendants acknowledge that two aspects of its designation of critical habitat for the snake contain errors which require remand. These are: 1) the economic analysis; and 2) the legal description of the critical habitat. Defendants claim that the error in the economic analysis does not require the Final Rule to be vacated, but that the seriousness of the error in the legal description, as explained in the Frazer Declaration, does require

that the Final Rule be vacated. On the issue of the seriousness of the error and its disruptive consequences, Defendants assert that until the errors in the legal description are corrected, some property owners in the regulated area will remain unsure whether their property is inside of the critical habitat boundaries, because different interpretations of the legal descriptions can produce very different results. *See* Frazer Declaration at 3. Defendants argue that while the Section 7 consultation process and the exclusion criteria, 65 Fed. Reg. 58949, would allow the Service to determine whether a given parcel was critical habitat, the Section 7 consultation process can, as Plaintiffs note, also place additional regulatory burdens on a land owner. Defendants repeat their argument, first made in connection with their Motion for Voluntary Remand, that no harm to the snake will be caused by vacating the Final Rule, because the protections of the ESA Sections 7, 9 and 10 remain in place. *See* 16 U.S.C. §§ 1536, 1538, and 1539.

Intervenor disagrees with both Plaintiffs and Defendants and contends that if the court determines that it is necessary to remand the Final Rule to the Service, it should do so without vacating it. Intervenor argues that serious concerns exists here regarding the potential extinction of an animal species, citing *Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392, which concerned a challenge to the final rule listing the Bruneau Hot Springs Snail as an endangered species. The Ninth Circuit struck down the listing but left the rule in place on remanding based on equitable concerns. In particular, it noted concern existed about the potential extinction of the animal species, because there was no dispute that the flow in the only known spring to constitute habitat for the snail was greatly reduced. *Id.* at 1405. The court is unwilling to rely on the reasoning in *Idaho Farm Bureau* in the present

case, finding that it does not involve such a dire situation. That is, the present case concerns the designation of critical habitat for a threatened species, not the listing of a species as endangered. Further, while the Ninth Circuit in *Idaho Farm Bureau* found that setting aside an entire final rule would be wasteful when a more closely tailored remedy was available, the error in question was the agency's failure to make available for public comment a particular study relied upon by the agency. Here, the court has found much more serious and pervasive errors on the part of the Service, which weighs against leaving the Final Rule in place.

Intervenor disagrees with Plaintiffs' claim that leaving the Final Rule in place will impose significant burdens on them and other private landowners, arguing that the Section 7 requirements triggered by a federal nexus apply based not only on the designation of critical habitat but also on the listing of the species. Intervenor explains:

> For the whipsnake, critical habitat has been designated within the occupied geographical range of the species. Therefore, all federalized projects within critical habitat are already required to incur the costs of conducting a biological assessment under Section 7, by virtue of the listing decision alone. If the biological assessment indicates that the project "may affect" the listed species, then a full biological opinion will be required. It is only at this point in the process that the designation of critical habitat may impose additional costs; if the action will not jeopardize the species, but will adversely modify its critical habitat, restrictions that would not otherwise result from listing alone could be required. Up until that point, the regulatory burden to assess the habitat applies as a result of the listing alone, regardless of whether critical habitat has been designated. Of course, as discussed below,

under the Service's current regulations, there also will be no additional economics [sic] impacts from conditions imposed in the biological opinion because the regulations consider jeopardy to the species and adverse modifications of its critical habitat to be equivalent.

Intervenor's Reply, fn. 5.

Intervenor further contends that equitable considerations weigh heavily in favor of leaving the Final Rule in place pending any remand. Specifically, Intervenor argues that the snake has only gained protection for its critical habitat after a long process culminating in the court-ordered designation at issue here, and that it remains threatened by ongoing destruction and fragmentation of its habitat. Intervenor argues that this leaves the snake vulnerable to extinction and so will frustrate the purposes of the ESA. Intervenor cites *Western Oil and Gas*, 633 F.2d at 813, in which the Ninth Circuit held that in deciding to leave in place a challenged regulation pending remand to permit further public comment, it was "influenced by the possibility of undesirable consequences which we cannot now predict that might result from invalidation of the designations." Again, the court finds that the errors by the Service in this case are much more serious than the violations of the prior notice and comment requirements that were found in *Western Oil and Gas*.

 Based on all of the parties' arguments, the court finds that Sections 7 and 10 of the ESA impose their burdens based on *either* the listing of the species or the designation of critical habitat. *See* 16 U.S.C. section 1536(a)(2)(creating a duty to insure that actions neither "jeopardize the continued existence of any endangered species or threatened species" nor results in "the destruction or adverse modification of habitat of such species"); 16 U.S.C. § 1539(a) (authorizing the issuance of per-

mits to engage in acts otherwise prohibited by section 1538, which prohibits the "taking" of a listed species or the violation of any regulation pertaining to such species). This finding results leads the court to two conclusions. First, the court concludes that existence of the critical habitat designation does not impose significantly greater burdens on Plaintiffs or other private landowners than are imposed by the listing of the species under the ESA. Thus, the court finds that Plaintiffs have overstated the burden they will carry if the status quo is maintained and the Final Rule is left in place upon remand. Therefore, the court rejects this argument as a basis for vacating the Final Rule.

Second, however, the court also concludes that, because the statutory protections afforded by designating the critical habitat parallel those afforded by listing the species as threatened, vacating the Final Rule would not expose the snake to significantly greater threats of extinction. Therefore, the court is unconvinced by Intervenor's arguments that the Final Rule should remain in place to protect the snake from "ongoing destruction and fragmentation of its habitat," and that vacating the Final Rule upon remand will not violate the purposes of the ESA

Finding itself unconvinced by any of the parties' equitable arguments except that vacating the Final Rule would not expose the snake to significantly greater threats of extinction, and having found that designation of the critical habitat for the snake to violate the ESA and the APA on numerous grounds, the court concludes that vacating the entire existing Final Rule is the only proper course of action in this case.

### ORDER

In light of the foregoing Memorandum Opinion, IT IS HEREBY ORDERED that:

1) Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion is DENIED as to Plaintiffs' claim that the designation of critical habitat does not comport with the statutory definition of occupied geographic areas under 16 U.S.C. § 1532(5)(A), except that Plaintiffs' motion is DENIED and Defendants' motion is granted on the single issue of whether the Service designated as critical habitat less than the entire area that can be occupied by the snake;

2) Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion is DENIED as to Plaintiffs' claim that the Service failed to comply with the requirement that it consider the best scientific data available under 16 U.S.C. section 1533(b)(2);

3) Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion is DENIED as to Plaintiffs' claim that the Service failed to adequately evaluate the economic impacts of designating the critical habitat for the snake;

4) Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion is DENIED as to Plaintiffs' claim that the Service failed to comply with the notice requirements for the proposed rule;

5) Plaintiffs' motion for summary judgment is DENIED and Defendants' motion is GRANTED as to Plaintiffs' claim that the Service failed to adequately respond to public comments on the proposed rule;

6) Plaintiffs' motion for summary judgment is DENIED and Defendants' motion is GRANTED as to Plaintiffs' clam that the Service erred in failing to complete an adequate assessment under the NEPA;

7) Plaintiffs' motion for summary judgment is GRANTED on Plaintiffs' claim that Defendants failed to adequately conduct the regulatory flexibility analysis under the RFA;

8) Plaintiffs' motion for summary judgment is GRANTED as to Plaintiffs' claim that Defendants failed to adequately conduct the analysis required by the SBREFA;

9) The Final Rule designating the critical habitat for the snake published in the Federal Register on October 3, 2000, is VACATED and REMANDED to the Service for further action in compliance with this Memorandum Opinion and Order;

10) A status conference is HEREBY SET for June 2, 2003, at 1:30 p.m., at which time the parties shall be prepared to discuss the time by which the Service shall issue a new Final Rule.